Suzanne **BENTLEY**, et al., Plaintiffs,

v.

**HONEYWELL INTERNATIONAL INC.**, et al., Defendants.

No. 03CV–079.

United States District Court,
S.D. Ohio,
Eastern Division.

Sept. 23, 2004.

William Robert Jacobs, Cincinnati, OH, Anne E. Viner, Michael D. Hayes, Norman B. Berger, Varga, Berger, Ledsky, Hayes & Casey, Chicago, IL, David J. Fish, Edward J. Manzke, Shawn M. Collins, The Collins Law Firm PC, Naperville, IL, for Plaintiffs.

Mark Gerard Kobasuk, Robert Joseph Parker, Taft, Stettinius & Hollister, Cincinnati, OH, Alison C. Conlon, Brian W. Lewis, Ethan A McKittrick, H. Roderic Heard, Wildman, Harrold, Allen & Dixon, Chicago,

**474**

IL, Daniel Jerome Buckley, Mark Alan Norman, Sandra Jo Anderson, Vorys, Sater, Seymour & Pease, Columbus, OH, Garrett B. Johnson, Helen E. Witt, Thomas Edwin Dutton, Kirkland & Ellis, Chicago, IL, for Defendants.

Ellen M. Brooks, John Julius Fahsbender, Craig L. Moore, Benesch, Friedlander, Coplan & Aronoff LLP, Cleveland, OH, Amy J. Kappeler, Cary R. Perlman, Latham & Watkins LLP, Chicago, IL, John Elliot Jevicky, Dinsmore & Shohl, Cincinnati, OH, Stephen Charles Fitch, Chester, Willcox & Saxbe, Columbus, OH, E. Sean Griggs, Barnes & Thornburg, Indianapolis, IN, Diane Leslie Gentile, Cooper & Gentile Co., Dayton, OH, Paul W. Schroeder, Jones, Day, Reavis & Pogue, Chicago, IL, John A. Rego, Jones, Day, Reavis & Pogue, Cleveland, OH, for ThirdParty Defendants.

### OPINION & ORDER

MARBLEY, District Judge.

### I. INTRODUCTION

This matter is before the Court on Plaintiffs's Motion for Class Certification. Lead Plaintiffs,[1] Suzanne and Gerald Bentley (the "Bentleys") and Recinda and William Bowshier (the "Bowshiers") (collectively "Plaintiffs" or "named Plaintiffs"), filed this action against Defendants, Honeywell International, Inc. ("Honeywell") and Siemens Energy & Automation, Inc. ("Siemens") (collectively "Defendants") for allegedly contaminating Plaintiffs's domestic water supplies and the groundwater underlying Plaintiffs's properties with toxic chemicals released from De-

fendants' facilities, located in Urbana, Ohio. Plaintiffs seek to certify two subclasses defined as all persons who:

(a) own or reside in residential property in the area of contamination[2] caused by Defendants of certain chemicals (the "Plume Class"); and/or

(b) own or reside in residential property which derives its water from the City of Urbana municipal water system, which itself is contaminated by Defendants' releases of hazardous chemicals (the "Municipal Water Class").

For the following reasons, the Court **GRANTS** Plaintiffs's Motion for Class Certification and certifies the two subclasses under subsections 23(b)(2) and (3) of the Federal Rules of Civil Procedure.

### II. FACTS[3]

The Bentleys are Ohio citizens who reside on the property they own at 1250 State Route 55, Urbana, Ohio 43078. The Bowshiers are Ohio citizens, residing on property they own in Urbana, Ohio, located at 1510 State Route 55. Generally, persons living in Urbana obtain their domestic water supply in one of two ways: 1) from the municipal water system that distributes water drawn from municipal wells to residents and property owners; or 2) from private wells that draw water directly from the groundwater underlying the private well. Both the municipal water system and the private wells, however, draw their water supplies from the Mad River buried valley aquifer system, which has been designated by the federal government as the sole source aquifer for the region.[4] At

---

1. Kathryn and Mark Seelig originally were named as Lead Plaintiffs. Subsequently and prior to Plaintiffs filing of their Amended Complaint, however, the Seeligs were compelled, for personal reasons, to withdraw as class representatives and from the litigation, in general.

2. In their Reply Memorandum, Plaintiffs make clear that the area of contamination is a single, commingled groundwater plume that allegedly was caused by Defendants' combined volatile organic compound ("VOC") spills. Therefore, throughout the remainder of this Opinion & Order, the Court will refer to the area of contamination underlying the proposed subclass (a) members' properties as the "commingled groundwater plume" or "commingled plume."

3. The following facts are taken from Plaintiffs's Amended Complaint and are assumed true for purposes of deciding this Motion. *Mayo v. Sears, Roebuck & Co.,* 148 F.R.D. 576, 579–80 (S.D.Ohio 1993) (holding that, for purposes of a class certification motion, the court must accept as true all factual allegations in the complaint and may draw reasonable inferences therefrom).

4. According to the Ohio EPA, "Urbana is located in central Champaign County, Ohio, and is the largest community in this predominantly agricultural county. Urbana's two well fields serve approximately 11,000 residents. The Urbana Mad River Well Field is located approximately three miles southwest of the center of Urbana.

the time Plaintiffs filed this action, they relied upon private wells for their water supply. Since then, however, both the Bentleys and the Bowshiers have been connected to the Urbana municipal water system, from which they now receive their domestic water supply.[5]

Honeywell is a Delaware corporation with its principal place of business in Morristown, New Jersey. Honeywell owns and operates a manufacturing facility located at 515 N. Russell Street in Urbana (the "Honeywell facility"). Siemens also is a Delaware corporation, with its principal place of business in Alpharetta, Georgia.[6] It owns and operates a manufacturing facility located at 145 Dellinger Road, Urbana, Ohio (the "Siemens facility").

According to Plaintiffs, for decades Defendants have released toxic chemicals into the environment surrounding Defendants' facilities. Principally, Defendants allegedly have spilled and released industrial solvents containing the volatile organic compounds ("VOCs") known as trichloroethene ("TCE") and tetrachloroethene ("PCE"). Both TCE and PCE have been shown to: cause cancer, liver and kidney damage; impair heart function and fetal development; and cause convulsions, coma, or even death.

Defendants' releases, Plaintiffs claim, have merged together to form a single commingled "plume" of groundwater contamination (depicted by the map at Exhibit 1 to Plaintiffs's Amended Complaint) that underlies a substantial portion of the City of Urbana. This commingled plume, Plaintiffs aver, has contaminated private wells and two public wells that provide drinking water to the entire city of Urbana. Plaintiffs contend that

Defendants' releases have impacted and contaminated their municipal water supply.

Defendants allegedly have known about the contamination for many years but did not make the citizens of Urbana aware of it nor take adequate investigatory and remediation efforts. Specifically, Plaintiffs contend that Honeywell knew as early as 1987 that its property was contaminated, and knew since 1995 that the groundwater underneath its property was contaminated. As for Siemens, Plaintiffs contend that it knew since at least the 1980s that both its soil and groundwater were highly contaminated. Plaintiffs, however, allege that they did not learn of the contamination of their properties and water supply until the spring of 2001.

Indeed, as early as August 23, 2001, the Ohio Environmental Protection Agency ("Ohio EPA") reported that, "[w]hile the water currently provided [sic] Urbana's public water system is safe, Ohio EPA is concerned about the potential future threat." News Release: Ohio EPA Investigates Ground Water Contamination Impacting Drinking Water Wells in Urbana, *available at* http://www.epa.state.oh.us/pic/nr/2001/august/urbana.html (Aug. 23, 2001). Accordingly, the Ohio EPA undertook field investigation beginning in 1993 and identified Honeywell and Siemens as "contributors to the ground water contamination in the Urbana area." Urbana Mad River Well Field, *available at* http://swdoweb.epa.state.oh.us/SWDO/DERRsites/urbana—mad—river—well—field.htm (last updated Jan. 2003). Subsequent investigation also revealed that properties occupied by Johnson Welded Products and Q3 JMC, Inc. were additional sources of VOC contamination in the Urbana Mad River Well

---

The two production wells of the Mad River Well Field are installed in thick glacial outwash sand and gravel deposits associated with the Mad River buried valley aquifer system. The aquifer system has received federal designation as the sole source aquifer for the region. The two wells comprising the Mad River well field currently supply approximately 1.5 million gallons of water per day." Urbana Mad River Well Field, *available at* http://swdoweb.epa.state.oh.us/SWDO/DERRsites/urbana—mad—river—well—field.htm (last updated Jan. 2003).

5. This change in circumstances moots many of Defendants' arguments that Plaintiffs cannot represent the class because they have not identified a class to which they belong and/or they have not presented claims typical of those of the other class members simply because Plaintiffs used private wells.

6. Plaintiffs further allege, as required by Local Rule 82.1(d) that Siemen's principal place of business within the judicial district from which this case originated is in Cincinnati, Ohio.

Field. *Id.* Consequently, in December of 2002, the "Ohio EPA sent letters to Siemens, Honeywell, [sic] Johnson Welded Products requesting that they enter into an Administrative Order of Consent (AOC) to characterize the VOC plume, evaluate remedial options and implement clean up." *Id.*

Plaintiffs allege that Defendants "have refused to fully address the releases [of TCE and PCE] so as to mitigate the threats posed [to Plaintiffs]." As a result, Plaintiffs complain that the contamination continues to damage and threaten their properties and water supplies, causing their property values to have decreased substantially, and causing them to have suffered inconvenience, annoyance, and discomfort, and deprivation of the full use and enjoyment of their properties. Plaintiffs argue that Defendants are jointly and severally liable.

Plaintiffs bring claims under: 1) the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a) (Count I), for cost recovery; and 2) the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B) (Count VI), for injunctive relief. In addition, they allege state law claims for: 1) negligence (Count II); 2) private nuisance (Count III); 3) trespass (Count IV); 4) willful and wanton misconduct (Count V); and 5) public nuisance (Count VII). Plaintiffs seek class-wide injunctive and monetary relief, but seek class certification on the issues of Defendants' liability and the appropriateness of injunctive relief only. According to Plaintiffs's Motion for Class Certification, the class of persons injured by Defendants' actions likely exceeds 3,000 people.[7]

### III. STANDARD OF REVIEW

■ Within the dictates of Rule 23, a district court has broad discretion in determining whether to certify a class. *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1079 (6th

Cir.1996) (hereinafter *"A.M.S."*); *In re Cincinnati Radiation Litigation,* 187 F.R.D. 549, 551 (S.D.Ohio 1999). Before certifying a class, however, a court must engage in a "rigorous analysis" of the plaintiff's ability to meet the requirements of Rule 23(a). *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Stout v. J.D. Byrider,* 228 F.3d 709, 716 (6th Cir. 2000); *Reeb v. Ohio Dep't of Rehab. & Corr.,* 81 Fed.Appx. 550, 555, 2003 WL 22734623, *3 (6th Cir. Nov.19, 2003) (unpublished). The party that moves for class certification has the burden of proof. *A.M.S.,* 75 F.3d at 1079 (stating that, as a prerequisite to certification of a class action, plaintiffs must show that the action satisfies Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation).

■ In making its determination, however, the court must not inquire into the merits of the underlying claims. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). A court must accept as true the allegations in the complaint,[8] while keeping in mind that resolution of the certification issue may require the court "to probe behind the pleadings." *Falcon,* 457 U.S. at 160, 102 S.Ct. 2364. The court, additionally, "may consider reasonable inferences drawn from facts before [it] at that stage of the proceedings." *Senter v. Gen. Motors Corp.,* 532 F.2d 511, 523 (6th Cir.1976); *In re Cincinnati Radiation Litigation,* 187 F.R.D. at 552. And plaintiffs may not rely on pure speculation to satisfy the requirements under Rule 23. *Cwiak v. Flint Ink Corp.,* 186 F.R.D. 494, 497 (N.D.Ill. 1999); *see A.M.S.,* 75 F.3d at 1079 (noting that a court may not certify a class action based solely on "its designation as such in the pleadings," but only where "an adequate statement of the basic facts" demonstrates that each of Rule 23's requirements are met). Finally, after certification, "the class definition is subject to refinement based upon fur-

---

7. In their Memoranda in Opposition, Defendants argue that Plaintiffs's proposed class(es) include approximately all 12,000 Urbana, Ohio residents.

8. *Reeb,* 81 Fed.Appx. at 555, 2003 WL 22734623 at *3 ("A district court may not inquire into the merits of the class representatives' underlying

claims, but should accept the complaint's allegations as true.") (internal citation omitted); *see also Shelter Realty Corp. v. Allied Maint. Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978); *Mayo v. Sears, Roebuck & Co.,* 148 F.R.D. 576, 579 (S.D.Ohio 1993).

ther development of the record, and can be expanded or contracted if the facts so warrant ..." *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 61–2 (S.D.Ohio 1991). The Court even can decertify a class if there is a subsequent showing that the grounds for granting certification no longer exist or never existed. *Falcon*, 457 U.S. at 160, 102 S.Ct. 2364.

## IV. ANALYSIS

### A. Definition of the Class

■■■ Before delving into the "rigorous analysis" required by Rule 23, a court first should consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class. *See East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) (discussing membership in a proposed class); *Reid v. White Motor Corp.*, 886 F.2d 1462, 1471 (6th Cir.1989) ("A class representative must be part of the class and 'possess the same interest and suffer the same injury as class members.'") (citations omitted). While class definitions obviously are tailored to the specifics of every case, important elements of defining a class include: (1) specifying a particular group that was harmed during a particular time frame, in a particular location, in a particular way; and (2) facilitating a court's ability to ascertain its membership in some objective manner. *Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 580 (1st Cir.1986) (holding that a class could not be certified because the definition "ma[de] class members impossible to identify prior to individualized fact-finding and litigation" and thereby failed "to satisfy one of the basic requirements for a class action under Rule 23"); *see Rodriguez v. Berrybrook Farms, Inc.*, 672 F.Supp. 1009, 1012 (W.D.Mich.1987) (finding that plaintiffs met the requirement for defining a class because the definition specified a group of laborers "during a specific time frame and at a specific location who were harmed in a specific way ...") (citations omitted). Generally, "[a] class will satisfy the definiteness requirement as long as it is defined in terms of objective criteria like the defendants' conduct as opposed to the state of mind of the parties." *LeClercq v. Lockformer Co.*, 2001 WL 199840, *2 (N.D.Ill. Feb.28, 2001) (unpublished).

Plaintiffs propose two subclasses for certification: 1) persons who own or reside in residential property in the area overlying the commingled groundwater plume; and/or; 2) persons who own or reside in residential property that derives its water from the City of Urbana municipal water system.[9] Honeywell does not contest the proposed class definitions. Siemens argues that Plaintiffs have not identified a precisely-defined class to which they belong because they get their water supply from private wells and do not reside in the area of contamination caused by Siemens. As discussed above, however, the first part of Siemens' argument is moot because Plaintiffs now are connected to the municipal water supply. As for Siemens' contention that the named Plaintiffs's properties were not contaminated by its releases, that is a merits' argument that the Court cannot consider in deciding this Motion. *Eisen*, 417 U.S. at 178, 94 S.Ct. 2140.

Third–Party Defendant, Gould Electronics, Inc. ("Gould"), takes issue directly with Plaintiffs's definitions and claims that they are too vague.[10] Gould offers as an example

---

9. Because these are the theories presented by Plaintiffs in their Amended Complaint, which the Court is obliged to accept as true, it would be improper for the Court to consider, at this stage, Defendants' arguments in their Memorandums in Opposition that each property and each class members' water supplies would have to be tested individually to determine whether they are contaminated, and if so, by what source(s). Plaintiffs's theory is that the commingled plume underlies the Plume Classes' properties and Defendants, together, contaminated the municipal water supply. If Plaintiffs are successful in proving these theories, then there would be no need for individual testing, as Defendants argue.

10. Gould is a Delaware corporation, having its principal place of business in Eastlake, Ohio. Gould operated the Siemens' facility from 1956 until January 31, 1983, when Gould transferred possession of the property to Siemens.

Honeywell impleaded Gould by filing its Third–Party Complaint on September 30, 2003. In addition to Gould, Honeywell named as third-party defendants: CV Materials, Ltd., Navistar International Corporation, International Truck and Engine Corporation, Johnson Welded Prod-

an apartment building owned by one person, but resided in by many different tenants. Both the owner and the tenants would be in the Plume Class as it presently is defined by Plaintiffs. Gould argues that to permit both the owner and her tenants to recover would be double recovery for the same injury.

■ At the class certification hearing, Plaintiffs's counsel clarified that during the damages' phase of the trial, tenants would not be eligible for property damages. They are included in the definition at this phase of the trial, however, because if the class is found to be entitled to injunctive relief, they are entitled to such relief. Thus, upon clarification, the Court is satisfied that the class definitions do not pose the risk of double recovery. *See Ludwig v. Pilkington,* 2003 WL 22478842, *1 (N.D.Ill. Nov.4, 2003) (unpublished) (where the court certified a subclass defined as Plaintiffs propose here, namely: "all persons who reside or own property in Naplate.").

### B. Rule 23(a) Requirements

The Court now turns to the issue of whether the proposed class satisfies the strictures of Rule 23. Federal Rule of Civil Procedure 23 provides:

(a) **Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED.R.CIV.P. 23(a).

For similar reasons, Defendants contend that Plaintiffs have not met their burden of proof under Rule 23. According to Defendants, mass torts actions such as this one are widely recognized as being inappropriate for class treatment. Defendants argue that there are too many differences between Plaintiffs and the proposed class members and between their respective properties and water sources. Plaintiffs dispute those contentions, and argue, furthermore, that Defendants inappropriately seek merit determinations on Plaintiffs's Motion for Class Certification.

The Court will address each of the parties' specific arguments and responses regarding the Rule 23 requirements. As a threshold consideration, however, preliminary issues must be addressed. Defendants, in their class certification papers, do make merit-based arguments. They do so in the context of arguing that this case, and the persons who would be included in the class, pose too many individual factual and legal differences to permit class certification. Honeywell, for example, argues that PCE and TCE are ubiquitous in the environment and not necessarily harmful to human health. It contends that there are safe levels of exposure, and that the Ohio EPA has determined that Urbana's public water supply is safe.[11]

Defendants further argue that to the extent that there is TCE and/or PCE in Urbana's soil and groundwater, it came from multiple sources, although they concede that they are two of those sources. Honeywell avers, for example, that it released primarily

ucts, Inc., and Q3 JMC Inc. (collectively, "Third–Party Defendants"). Honeywell filed an Amended Third–Party Complaint on November 7, 2003, and thereafter filed a Notice of Voluntary Dismissal of Count III of its Third–Party Complaint against Navistar and International Truck and Engine Corporation. Honeywell filed its Second Third–Party Amended Complaint against all of the originally-named third-party defendants on February 9, 2004, essentially seeking contribution from the Third–Party Defendants, in the event that Honeywell is found liable to Plaintiffs.

**11.** Not only is this argument an improper merit-based argument—*more properly presented in a*

motion to dismiss or for summary judgment—it also ignores the reality that Plaintiffs's claims are for *property damage.* Regardless of whether the municipal water supply has been deemed safe by the Ohio EPA and/or determined to be below the federal and state established maximum contaminant levels ("MCL"), the Municipal Water Supply Class Members still may have suffered diminution in their property values merely from the knowledge and presence of cancer-causing chemicals detected in their homes' water supplies.

PCE. Its expert concluded that the Bowshiers' property, in contrast, is contaminated primarily with chemicals other than PCE. Honeywell argues, therefore, that it cannot be liable for the Bowshiers' property's contamination.

Likewise, Siemens claims that the "area of contamination" illustrated by Plaintiffs's map is exaggerated in scope and extent and fails to account for other sources of contamination. Siemens maintains, further, that the Bowshiers' property could not have been contaminated by any conduct attributable to it because Siemens released primarily TCE, which is different from the trichoroethane ("TCA") that Siemens' expert determined to be the dominant chemical in the Bowshiers' groundwater. In addition, Siemens offers a detailed factual account of how the groundwater pumped from two different well fields simultaneously supplies water to the city's water distribution system. According to Siemens' expert, the mixing from the two well fields, at varying proportions, creates variations in the concentrations of TCE and PCE, if any, delivered to each class member. Siemens' expert concludes, therefore, that some portions of the alleged plume area have no VOC contamination at all, and the portions that are contaminated encompass seven (7) distinct chemical plumes and six (6) sources with confirmed releases of VOCs. Siemens argues that such evidence further demonstrates that individual issues in this case overwhelm any common issues.

About these arguments, the Court notes four things. First, to the extent that Defendants contest Plaintiffs's theory that the contamination was jointly caused by Defendants' actions and offer their own theories of multiple sources of contamination and many polluters, with different releases, such issues are factual in nature. Assuming Plaintiffs are able to survive summary judgment, they have a constitutional right to have those issues determined by a jury and not this Court.

Second, the Sixth Circuit, as well as others, has held that class certification will not be denied simply because the class members' claims have some factual dissimilarities. *Sterling v. Velsicol Chemical Corp.*, 855 F.2d

1188, 1197 (6th Cir.1988); *see also, Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992). Third, Defendants' arguments may be valid, but they cannot be considered by the Court at this stage in the proceedings. Those arguments go to the merits of Plaintiffs's claims and may be presented in a motion to dismiss or on a motion for summary judgment, but not in a motion for class certification. *See, e.g. Boggs*, 141 F.R.D. at 62 (commenting that defendants' arguments that "neither lifetime nor annual doses of radiation to class members, attributable to the Portsmouth plant are significant enough to cause either a reasonable risk of health effects or any loss of property value," are merit issues). As the *Boggs* court noted when faced with a similar presentation of merits' arguments on a motion for class certification:

> Although the parties have submitted a great deal of factual material, and defendants argued the facts of the case at length, there are relatively few facts that are crucial to class certification. Essentially, the facts can be subdivided into two categories: those relating to class definition (that is, evidence that something occurred to distinguish the members of the class from the general public), and to class size. The balance of the issues raised by this motion are primarily, if not completely, legal ones.

141 F.R.D. at 60. Likewise, as the court expressed in *In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 297, 311 (E.D.Mich. 2001):

> The fact that Defendants' expert disagrees with Plaintiffs' expert ... is neither surprising nor relevant. Such merit-based arguments are inappropriate at the class certification stage of the litigation. At this stage, the Court should not delve into the merits of an expert's opinion or indulge "dueling" between opposing experts.

*Id.* (internal citation omitted); *see also LeClercq*, 2001 WL 199840 at *3 (stating, "[i]n response to [Defendant's] arguments that Plaintiffs' testing shows inconsistent results within this area, the Court notes that a hearing on the merits of Plaintiffs' case is not

appropriate at this juncture and Rule 23 does not provide for it.").

Fourth and finally, the Sixth Circuit has opined on the propriety of certifying classes in so-called mass torts cases, and it reasoned:

the problem of individualization of issues often is cited as a justification for denying class action treatment in mass tort accidents. While some courts have adopted this justification in refusing to certify such accidents as class actions, numerous other courts have recognized the increasingly insistent need for a more efficient method of disposing of a large number of lawsuits arising out of a single disaster or a single course of conduct. In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next. No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action. *Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.*

*Sterling*, 855 F.2d at 1196–97 (emphasis added). The *Sterling* Court provided the following guidance:

In complex, mass, toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each Defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving the controversy. *However, where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy.*

*Id.* at 1197 (emphasis added). The *Sterling* principles guide this Court in deciding whether Plaintiffs have met the requirements of Rule 23.

### 1. Numerosity

Rule 23(a)(1) requires that the purported class be "so numerous that joinder of all members is impracticable...." FED. R.CIV.P. 23(a)(1). Numerosity, although so named, imposes no specific numerical requirements upon the class. A threshold number of class members is not required, though numbers alone may be sufficient to satisfy numerosity if the numbers are great enough. *A.M.S.*, 75 F.3d at 1079 ("When class size reaches substantial proportions ... the impracticability requirement is usually satisfied by the numbers alone."); *see also Ludwig*, 2003 WL 22478842 at *2 ("Generally, classes with more than one hundred plaintiffs satisfy the numerosity requirement."). Plaintiffs merely are required to provide a reasonable estimate or some evidence of the number of class members. *Mejdreck v. The Lockformer Co.*, 2002 WL 1838141, *3 (N.D.Ill. Aug.12, 2002) (unpublished), *aff'd in Mejdrech v. Met–Coil Systems Corp.*, 319 F.3d 910 (7th Cir.2003).

Here, Plaintiffs suggest that the two subclasses likely will exceed over 3,000 members. Based upon the map attached to Plaintiffs's Amended Complaint, it is apparent that the alleged commingled plume underlies a sizable portion of the City of Urbana. Additionally, the majority of Urbana's residents are connected to the city's municipal water system. Urbana's population is in excess of 10,000; hence, the Plume and Municipal Water Classes, together, easily satisfy the numerosity requirement.[12]

### 2. Commonality

To meet the commonality requirement, "there need be only a single issue common to all members of the class." *A.M.S.*, 75 F.3d at 1080 (quotation omitted). The Sixth Circuit has stated that, "[t]he commonality requirement is interdependent with the impracticability of joinder requirement, and the 'tests together form the underlying conceptual basis supporting class actions.'" *Id.* (citation omitted). This element later was sim-

---

12. *Defendants, in fact, do not contest that Plain-* tiffs have satisfied this element.

plified by the Sixth Circuit when it found, "[a]lthough Rule 23(a)(2) speaks of 'questions' in the plural, we have said that there need only be one question common to the class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir.1998) (qualifying this statement by adding, "[w]hat we are looking for is a common issue the resolution of which will advance the litigation."). Some courts explain the commonality requirement as necessitating a "common nucleus of operative fact," and find that the requirement is satisfied "where the Defendant has engaged in some standardized conduct toward the proposed class members." *Mejdreck*, 2002 WL 1838141 at *3; *see also Ludwig*, 2003 WL 22478842 at *2. Finally, factual differences amongst the plaintiffs and/or the proposed class members will not preclude a finding of commonality. *See, e.g., Mejdreck*, 2002 WL 1838141 at *7 (determining in factually similar action for groundwater and soil contamination that, despite "differences in the proposed class members' properties," commonality requirement was met).

Plaintiffs aver that this case presents numerous common questions of law and fact, such as: 1) whether toxic chemicals spilled by Defendants migrated off their respective properties; 2) whether Defendants' releases have caused the commingled plume allegedly underlying the Plume Classes' properties; 3) whether Defendants' releases have impacted Urbana's municipal water supply; 4) whether Defendants have committed a trespass by contaminating the class members' properties and water supplies; and 5) whether and what type of remediation is necessary.

In response, Defendants argue that Plaintiffs's claims inherently are individual, and they cannot satisfy the commonality requirement. According to Honeywell, "exposure levels and sources, if any, will vary over time from property to property and class member to class member. [Therefore], [t]here is no commonality." Similarly, Siemens argues that the groundwater conditions throughout the alleged class area are not fully explained by Siemens' conduct. In essence, Defen-

dants argue that multiple sources caused the soil, groundwater and water supply contamination in Urbana, so there can be no single cause, common course of conduct, or common nucleus of operative fact.

Several courts have held, however, that, "the existence of more than one Defendant does not defeat class certification." *Cook v. Rockwell Intern. Corp.*, 151 F.R.D. 378, 385 (D.Colo.1993) (citing *Boggs*, 141 F.R.D. at 58, and noting, "the court certified a class of plaintiffs in an action against different defendants who operated the Portsmouth Gaseous Diffusion Plant at different times."). In other words, the existence of multiple sources of contamination over a period of time is not a *per se* bar to class certification in cases such as this one. The key issue is the alleged conduct engaged in by Defendants.

Indeed, when defendants' conduct towards the proposed class is alleged to be uniform, the commonality requirement is met. *See, e.g., Rankin v. Rots*, 220 F.R.D. 511, 523 (E.D.Mich.2004).[13] Likewise, in the case at bar, Plaintiffs allege that uniform conduct, releases of VOCs by both Honeywell and Siemens, together, caused the alleged harm.

The case *sub judice* is inapposite to *Ball v. Union Carbide Corp.*, 212 F.R.D. 380, 389 (E.D.Tenn.2002), upon which Defendants rely. In *Ball*, the court reasoned that class certification was not appropriate because there were multiple defendants, multiple claimants *and multiple accidents*. Here, Plaintiffs allege that Defendants engaged in similar conduct that, over time, caused one single harm—the commingled plume. If the Court were not required to accept Plaintiffs's theory of the commingled plume, then, of course, as Defendants argue, individualized issues about which of the many sources released what VOCs that migrated onto whose properties would predominate. But, where, as here, Plaintiffs allege a common course of conduct by Defendants that caused harm, class certification is proper.

█ Perhaps more importantly, though, Defendants' arguments merely contest

---

**13.** In *Rankin,* the court certified a class action against multiple defendants, various officers and directors, alleged to have breached their fiducia- ry duties under the Employment Retirement Income Security Act.

Plaintiffs's well-pleaded theory in their Amended Complaint that Honeywell and Siemens have created the commingled plume and contaminated the groundwater and municipal water supply. Plaintiffs's theory, which the Court is obligated to accept as true at this stage in the proceedings, presents a "common nucleus of operative fact:" Defendants' releases of TCE and PCE, which commingled to create the plume that contaminated Plaintiffs's properties and water supplies. Because Plaintiffs also have offered several common questions of both law and fact, they have satisfied the commonality requirement. *See Ludwig*, 2003 WL 22478842 at *2 (where Defendant argued that factual differences would lead to different legal claims and defenses such that the commonality requirement could not be met, the court, nevertheless, found plaintiffs had met the requirement and stated, "[n]one of these alleged differences, however, are so great as to overshadow the common questions presented by Plaintiffs ..."); *LeClercq*, 2001 WL 199840 at *5 (finding plaintiffs met commonality requirement after rejecting defendant's merits' arguments and explaining that, "Plaintiffs have alleged that Defendants have engaged in a common course of conduct over the years that has contaminated the water source that the putative class members use. It is the same conduct that allegedly caused the injury to all of the Plaintiffs, and there are common questions of law and fact.").

### 3. Typicality

"The commonality and typicality requirements are closely related ..." *Boggs*, 141 F.R.D. at 64; *see also Ludwig*, 2003 WL 22478842 at *3 ("The issue of typicality is closely related to commonality, and should be liberally construed.") (internal citations omitted). A named plaintiff's claim is considered to be typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the

same legal theory." *A.M.S.*, 75 F.3d at 1082. The requirement has been described as "the representative's interests [being] aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Id.* Briefly, "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399.

■ As with the commonality requirement, substantial identity between the operative facts of the named plaintiffs and the class in general is not necessary. 5 Herbert B. Newberg and Alba Conte, *Newberg on Class Actions* § 24.25 (3d ed.1992); *see also Thrope v. State of Ohio*, 173 F.R.D. 483, 489 (S.D.Ohio 1997) ("A representative's claim need not always involve the same facts or law to be typical, provided there is a common element of fact or law."); *In re Cincinnati Radiation Litigation*, 187 F.R.D. at 553 ("[t]he typicality requirement does not ... insist on identical claims."); *Olden v. La-Farge Corp.*, 203 F.R.D. 254, 259, 269 (E.D.Mich.2001) ("[a]lthough the named plaintiffs' claims must fairly encompass the class members' claim, they need not always involve the same facts or law.").

Plaintiffs aver that they have met the typicality requirement because the Bentleys and the Bowshiers have been impacted by the same practices and conduct that have affected the other class members, and the legal claims Plaintiffs assert are brought on behalf of themselves and the class. Honeywell protests, however, that by splitting their claims and asserting only claims for property damage, Plaintiffs cannot meet the typicality and adequacy requirements.[14]

Honeywell argues that if Plaintiffs are to be believed that Defendants' releases pose health risks, the adjudication of the property damage claims could have *res judicata* implications for any personal injury actions that class members may wish to bring in the future. In addition, at the hearing, Honeywell explained that it had been working with

---

14. Defendants' other argument that the typicality requirement is not met is because Plaintiffs relied on private wells for their water supply. That factual difference, however, no longer exists. In addition, Defendants do not contest that Plain-

tiffs's properties lie in the area overlying the commingled plume; they just contest that the area actually is commingled and contaminated, and if so, by whom and to what extent—issues, again, going to the merits.

the Ohio EPA to remediate the contamination in Urbana and that sometime in December 2004, because of its efforts, Urbana's drinking water no longer will have any detectable levels of TCE and/or PCE in it. Once that happens, Honeywell anticipates filing a dispositive motion arguing that this case is moot. According to Honeywell, a ruling on that motion will preclude any class members from later bringing personal injury actions because Ohio's law on claim splitting is clear that all available causes of action have to be brought at the same time. All of this proves, Honeywell argues, that the potential prejudice from class treatment suffered by the class members creates a conflict of interest between them and Plaintiffs, such that Plaintiffs cannot meet the typicality and adequacy requirements.

Plaintiffs rebut Defendants' claim-splitting characterization. Plaintiffs maintain that bodily injury claims will not be addressed, individually or on a class-wide basis, in this litigation. According to Plaintiffs, this action poses no *res judicata* implications for any class member who may want to bring a personal injury action in the future.

■ The First Circuit in *Cameron v. Tomes,* following the Supreme Court's rationale in *Cooper v. Federal Reserve Bank of Richmond,* has addressed this issue:

> Cases on res judicata, ample in many areas, are fairly sparse where preclusion of distinctive individual claims is urged based upon an earlier class action judgment. But in *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 880[, 104 S.Ct. 2794, 81 L.Ed.2d 718] (1984), the Supreme Court confirmed what common sense would suggest: a class action judgment . . . binds the class members as to matters actually litigated *but does not resolve any claim based on individual circumstances that was not addressed in the class action.*

990 F.2d 14, 17 (1st Cir.1993). Plaintiffs's claims on behalf of the class are for injunctive relief and property damages. Based upon the record before the Court, there would seem to be no reason to inquire into any bodily injuries allegedly suffered by the individual class members. Hence, *res judicata* would not apply to bar and/or prejudice any personal injury claims that the class members may have. To the extent that Honeywell is able to remediate the contamination of Urbana's water supply in December 2004, a ruling to that effect will not prejudice the class members who may have personal injury claims resulting from the contamination that allegedly has existed for many years.

As for Siemens, it argues that the elements of Plaintiffs's causes of action prevent them from satisfying the typicality requirement. It argued extensively at the class certification hearing that Plaintiffs's claims for private nuisance and trespass, for example, require individualized showings to prove *prima facie* cases. According to Siemens, because Plaintiffs used private wells, they may be able to prove "significant harm" to them, but not necessarily to the other class members who do not rely on private wells. In response, Plaintiffs explained that, besides that the factual predicate no longer exists— Plaintiffs now are connected to the municipal water supply—issues of damages and the extent of the harm suffered do not become relevant until the damages' phase of trial, in which individual treatment can be employed.

At this early stage of litigation, and based upon Plaintiffs's explanation and the fact that several other courts have certified cases very similar to this one, with the same or similar legal theories, Siemens' argument is not persuasive in defeating class certification. *See, e.g., Sterling,* 855 F.2d at 1194 (in a similar groundwater contamination case, in which the plaintiffs sought injunctive relief, as well as compensatory and punitive damages against the Defendant, the Sixth Circuit affirmed the district court's certification of the class where the plaintiffs brought claims against the Defendant for, *inter alia,* common law negligence, trespass and nuisance); *Boggs,* 141 F.R.D. at 64 (certifying class alleging claims for, *inter alia,* negligence, private nuisance, and willful and wanton misconduct under Ohio law); *Olden,* 203 F.R.D. at 259, 266 (certifying class where plaintiffs alleged claims for, *inter alia,* trespass, negligence and private nuisance under Michigan law and sought property damages and injunctive relief); *Mejdreck,* 2002 WL 1838141

at *1 (certifying class where plaintiffs brought claims for negligence, private nuisance, trespass, and willful and wanton misconduct, in addition to claims under CERCLA and the RCRA).

■ As discussed with regard to the commonality requirement, Plaintiffs's claims arise from the alleged same course of conduct by Defendants that gives rise to the claims of all class members, and because Plaintiffs's claims are based on the same legal theories advanced on behalf of the class as a whole, Plaintiffs meet the typicality requirement. *See Olden*, 203 F.R.D. at 270 (finding typicality requirement was met where, "[p]utative class members are alleging that the defendant's plant operation was the reason for their claim for damages. The plaintiffs allege that the defendant's plant emissions, the foreseeability of damages, and the similarity of [the type of] damages are common questions of fact among the putative class members. The putative class members claims may differ in the amount of damages due to each individual, but that feature alone is not fatal to a finding of typicality. In addition, the same legal theories apply to all the claims of putative class members.").

### 4. Adequacy of Representation

The Sixth Circuit has outlined two criteria for district courts to consider in determining whether representation of the class would be adequate: "1) [t]he representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interest of the class through qualified counsel." *Senter*, 532 F.2d at 524–25. The requirements of commonality and typicality tend to merge with the adequacy of representation requirement: "[all] serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364.

■ Rule 23(a)(4)'s adequacy requirement raises the additional concerns of the competency of class counsel and potential conflicts of interest. *Id.* With regard to the latter, an individual may not be an adequate representative if she is subject to unique defenses that place her in a position that is antagonistic to the interests of the class. *Levels v. AKZO Nobel Salt, Inc.*, 178 F.R.D. 171, 179 (N.D.Ohio 1998). However, "unique defenses asserted against class representatives need not ultimately destroy typicality. Typicality will only be destroyed where the defenses against the named representatives are 'likely to usurp a significant portion of the litigant's time and energy,' and there is a danger that the absent class members will suffer if their representative is preoccupied with defenses unique to it." *Frietsch v. Refco, Inc.*, 1994 WL 10014, *3 (N.D.Ill. Jan.13,-1994) (unpublished), quoting *McNichols v. Loeb Rhoades & Co.*, 97 F.R.D. 331, 334–35 (N.D.Ill.1982); *see also Mejdreck*, 2002 WL 1838141 at *4.

Defendants do not dispute the competency of class counsel; rather, they argue that Plaintiffs will not be adequate representatives because they receive their water supply from private wells. At the hearing, counsel for Siemens argued that the specific causes of action brought by Plaintiffs and their differing circumstance of once getting their water supply from private wells make them inadequate representatives. With regard to nuisance, for example, Siemens argued that Plaintiffs, in proving substantial interference with the use and enjoyment of their property, testified at their depositions about the unique interferences they suffered as well users. The Bentleys, for example, testified about needing to use bottled water to bathe and brush their teeth. Siemens contends that such unique interferences were not experienced by the majority of class members who were always connected to the municipal water supply; hence, Plaintiffs do not have common interests with the class members, making certification improper.

Siemens' arguments, however, are moot, in part, and premature, in other respects. They are moot because as discussed above, Plaintiffs now get their water from the con-

taminated municipal water supply, and they allegedly live on property overlying the commingled plume. "The harm suffered by the named plaintiffs may differ in degree from that suffered by other members of the class so long as the harm suffered *is of the same type.*" *Boggs,* 141 F.R.D. at 65 (emphasis original), quoting, *In re Asbestos School Litigation,* 104 F.R.D. 422, 430 (E.D.Pa.1984). Given the factual circumstances existing now and the allegations in the Amended Complaint, the named Plaintiffs have suffered the same type of harm as the rest of the class, at least since they were connected to the municipal water supply.

Moreover, such arguments are premature. With further discovery, Defendants may be able to prove that named Plaintiffs have not suffered the same type of harm as the class members even after being connected to the municipal water supply. If that becomes the case, then the Court will entertain arguments that named Plaintiffs are not adequate representatives; and, if appropriate, modify the class or remove the named Plaintiffs as the representatives.

■ Defendants also argue that because Plaintiffs and the class members will be subject to different defenses, such as the statute of limitations, "coming to the nuisance," or failure to incur response costs, a conflict of interest exists between Plaintiffs and the class members. Defendants, however, have not alleged that Plaintiffs, themselves, will be subject to unique defenses that other members of the class will not. Instead, Defendants suggest that they will have many different defenses applicable to some Plaintiffs and many class members. This argument was presented to the *Boggs* court, where it explained that although

> [i]t is unlikely that any significant number of class members have incurred response costs, . . . [and][t]he time when class members purchased property near the plant undoubtedly varies, to the extent that the named plaintiffs' dates of purchase also vary, that makes their claims more, rather than less, representative of the claims of the class as a whole. In short, the named plaintiffs have asserted claims both typical

of the other class members, and subject to typical defenses.

141 F.R.D. at 66. *See also Cook,* 151 F.R.D. at 386 (where Defendant attempted to argue that because some plaintiffs were subject to a statute of limitations defense, the class should not be certified, the court stated, "such a contention cannot serve to bar a class certification in that an inquiry into a claimed affirmative defense impermissibly allows an issue going to the merits of the litigation to intrude upon the class certification analysis required by Rule 23."). This Court agrees with the rationale in *Boggs. See also Ludwig,* 2003 WL 22478842 at *3 (court rejected defendant's contention that unique defenses arising out of causation and the statute of limitations defeated typicality). Defendants' assertions that they have a plethora of typical defenses available against some, many and/or all of the class members and named Plaintiffs does not create a conflict of interest between Plaintiffs and the class members, nor make Plaintiffs inadequate representatives. Thus, Plaintiffs are adequate representatives.

Furthermore, because Defendants do not contest the competency of counsel, the Court finds that Plaintiffs also have met this adequacy of representation requirement.

### C. Rule 23(b) Analysis

Because Plaintiffs have satisfied the strictures of Rule 23(a), the Court now has to determine whether the proposed class satisfies the additional requirements of Rule 23(b)(1), 23(b)(2) and/or 23(b)(3). *A.M.S.,* 75 F.3d at 1079. Rule 23(b) provides that class certification is proper when the plaintiffs have met the requirements of Rule 23(a), and:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>
> > (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
> >
> > (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of

the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

FED.R.CIV.P. 23(b). In their pleadings, Plaintiffs argued that certification was warranted under all three provisions, and Defendants contested the same. At the hearing, Plaintiffs clarified that they were seeking certification under 23(b)(2) and/or 23(b)(3), only. Therefore, the Court will limit its discussion to whether Plaintiffs have met the requirements for certification under those two provisions.

### 1. Rule 23(b)(2) Analysis

A court considering a(b)(2) certification should satisfy itself that: "(1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Robinson v. Metro–North Commuter Railroad Co.*, 267 F.3d 147, 164 (2d Cir.2001).

Plaintiffs aver that class certification under this subsection is warranted because Defendants, for years, have failed adequately to remediate their contamination. Plaintiffs seek a permanent injunction: 1) to stop Defendants from releasing hazardous chemicals into the soil and groundwater in Urbana; and 2) to force Defendants to remediate the effects of their previous releases. Defendants argue, however, that Plaintiffs seek substantial investigation and remediation costs, and despite Plaintiffs attempt to couch

such recovery as "equitable relief," "it is clear that such relief is incidental to the property damages [Plaintiffs] are claiming." Honeywell claims, furthermore, that it cannot fathom what Plaintiffs would have it do that it already has not done by working closely with Siemens and the Ohio EPA. It contends that there is no equitable relief available to Plaintiffs on a class-wide basis. Siemens contends, likewise, that it never used TCE or PCE, demonstrating, again, that Plaintiffs prayer for injunctive relief merely is an attempt to get class certification and what Plaintiffs really seek is monetary damages.

■ Besides the fact that, once again, Defendants make premature merits arguments, the Court does not find persuasive the argument that Plaintiffs's prayer for injunctive relief is incidental to their claims for monetary damages. The named Plaintiffs could have recovered their individual monetary damages, including any actions for personal injuries, in individual lawsuits. The fact that they are seeking to prosecute a class action is evidence of the importance they accord to obtaining class-wide injunctive relief.

If Plaintiffs succeed in establishing that Defendants' actions have caused the commingled plume and contaminated Urbana's groundwater and municipal water supply, injunctive relief would be an appropriate remedy. Because reasonable people in these Plaintiffs's position would bring an action to obtain injunctive relief, the Court finds that certification under Rule 23(b)(2) is proper.

### 2. Rule 23(b)(3) Analysis

Under Rule 23(b)(3), Plaintiffs must show that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members [predominance requirement], and that a class action is superior to other methods for the fair and efficient adjudication of the controversy [superiority requirement]." FED. R.CIV.P. 23(b)(3).

#### a. Predominance

The Sixth Circuit has noted that "[s]ubdivision (b)(3) parallels subdivision (a)(2) in that both require that common questions exist,

but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues." *A.M.S.*, 75 F.3d at 1084 (citation omitted). Many courts, recognizing the interplay between the requirements of 23(a) and (b), moreover, have reasoned that "a finding of commonality will likely satisfy a finding of predomination," and "issues are considered to predominate when there is a 'common nucleus of operative fact' among all class members." *Mejdreck*, 2002 WL 1838141 at *6; *Ludwig*, 2003 WL 22478842 at *4. See also *Fietsam v. Connecticut Gen. Life Ins. Co.*, 1994 WL 323313, *5 (N.D.Ill. June 27, 1994) (unpublished) (finding common questions of law or fact predominate when there is a common course of conduct that leads to all of the proposed class members' injuries); *Bates v. Tenco Services, Inc.*, 132 F.R.D. 160, 163–164 (D.S.C.1990) (finding that although there will be individualized proof issues in ground water contamination cases such as the one before the court, the common questions, such as whether there was contamination and whether the Defendant should be liable, predominate).

Plaintiffs contend that certification under 23(b)(3) is warranted because common issues predominate and many courts in factually similar, environmental property damage cases have certified classes under this subsection. Defendants argue, again, that individual issues preclude a finding of predominance. Honeywell, for example, professes that another individual aspect of this case comes from Plaintiffs prayer for punitive damages. Honeywell claims that the assessment of punitive damages depends upon an individual's injury and the relationship between Defendant and the individual. Honeywell argues that whether Defendants' actions are willful and wanton may be different for different plaintiffs, depending on the standard of care found to be owing to each class member, which has changed over time.

Such issues, however, pertain to damages, which can be handled separately after a trial to determine whether Defendants are liable for the commingled plume and water supply contamination. Many courts, including the Sixth Circuit in *Sterling*, hold that variations in potential damage awards will not defeat class certification. *Sterling*, 855 F.2d at 1196–97 ("No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action ... [T]he mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible."); *see also LeClercq*, 2001 WL 199840 at *7 (certifying a 23(b)(3) class under factually similar circumstances where plaintiffs sought punitive damages); *Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1269 (4th Cir.1981) (deciding that "[m]ere speculation as to conflicts that might develop at the remedy stage is insufficient to support denial of initial class certification."); *Ingram v. Joe Conrad Chevrolet, Inc.*, 90 F.R.D. 129, 131 (E.D.Ky.1981) (same).

In the factually similar cases of *Ludwig*, *LeClercq*, and *Mejdreck*, where the plaintiffs all alleged that the defendants had contaminated their soil and groundwater, and the defendants all argued that individualized issues predominated because of factual and legal differences, the courts determined that common issues predominated and certified classes under 23(b)(3). *Ludwig*, 2003 WL 22478842 at *5; *LeClercq*, 2001 WL 199840 at *19; *Mejdreck*, 2002 WL 1838141 at *18–20; *see also Sterling*, 855 F.2d at 1194. In addition, the *Ludwig* court rejected the argument made by Defendants here that multiple sources and manners of contamination precluded a 23(b)(3) certification. *Ludwig*, 2003 WL 22478842 at *5. It found that because there was an alleged single course of conduct and common nucleus of operative fact, "[a]lthough some individualized questions may exist, they should not defeat class certification." *Id.* The Court concurs in the sound reasoning of those other courts, which had cases before them very similar to this one.

 For all of these reasons, the Court agrees that this cause of action arises out of the same alleged course of conduct by Defendants and common questions predominate over individual ones.

### b. Superiority

As for the superiority requirement, courts should consider a number of factors when deciding whether a class action is the superior means of adjudication. These factors "include the interest of individual members in individually controlling the litigation, the desirability of concentrating the litigation in the particular forum, and the manageability of the class action." *Demitropoulos v. Bank One Milwaukee, N.A.*, 915 F.Supp. 1399, 1419 (N.D.Ill.1996).

Plaintiffs point out that most, if not all, of the individual members, even if they have some interest in controlling the litigation, likely do not have the financial means to do so. Cases like this one, which require sophisticated scientific inquires and expensive experts to opine about them, cost thousands and sometimes millions of dollars to litigate. As Plaintiffs suggest, "few, if any, residents would have damages sufficient to justify such expense, even if they could afford it."

Next, unlike other cases where class certification was denied because the courts found it was not the superior means of adjudication, here, all Plaintiffs and class members reside in one city and only federal law and one body of state law—Ohio law—will be applied. *See, e.g., Mejdrech*, 319 F.3d at 912 (reasoning in support of affirming the district court's certification of a class, that "[t]his is also not a case in which, because class members are scattered around the country and proceeding under the laws of different states, determination of class-wide issues would require the judge to create a composite legal standard that is the positive law of no jurisdiction. All the class members are residents of the same state and are proceeding under the same federal and state laws.") (internal citations omitted).

Finally, the proof that Plaintiffs will present regarding Defendants' actions, the history of their facilities' operations, and Defendants' use and misuse of TCE and/or PCE will be the same. It would be terribly inefficient to have hundreds, or potentially thousands, of plaintiffs to demonstrate such evidence to numerous courts; and, for that matter, for Defendants to have to defend repeatedly, with similar evidence and arguments, against the plaintiffs's claims. *See Boggs*, 141 F.R.D. at 67 ("To the extent that each claim of each plaintiff depends upon proof concerning the history of operations at the plant, the nature, timing, extent and cause of emissions, the kinds of remedies, if any, appropriate to address potential future emissions, ... [and] the generalized impact of the plant's operations on real property values, that proof would be virtually identical in each case. It would be neither efficient nor fair to anyone, including defendants, to force multiple trials to hear the same evidence and decide the same issues. Clearly, a Rule 23(b)(3) class could properly be certified under these circumstances."); *Ludwig*, 2003 WL 22478842 at *5; *LeClercq*, 2001 WL 199840 at *7 (noting that, "[r]epetitive discovery for individual cases on the same core issues would be wasteful for both the courts and the parties.").

Consequently, it is desirable to concentrate the litigation in this Court and to resolve the issue of Defendants' liability to Plaintiffs and the class members once and for all. At this point in the litigation, the Court is confident that this case most efficiently can be managed as a class action. Accordingly, certification also is appropriate under 23(b)(3).

## V. CONCLUSION

Based upon the foregoing analysis, the Court **GRANTS** Plaintiffs's Motion for Class Certification, certifying two subclasses as all persons who:

(a) own or reside in residential property in the area of contamination caused by Defendants of certain chemicals (the "Plume Class"); and/or

(b) own or reside in residential property which derives its water from the City of Urbana municipal water system, which itself is contaminated by Defendants' releases of hazardous chemicals (the "Municipal Water Class").

**IT IS SO ORDERED.**